**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

      **vs.**

**MANUEL GONCALVES,**

          **Defendant.**
_____

                **5:07-CR-257 (NAM)**

**APPEARANCES:**

Glenn T. Suddaby
United States Attorney
Office of the United States Attorney
100 South Clinton Street
Syracuse, NY 13261-7198

Office of George F. Hildebrandt
300 Crown Building
304 South Franklin Street
Syracuse, NY 13202
For Defendant

**OF COUNSEL:**

Ransom P. Reynolds, III
Assistant United States Attorney

George F. Hildebrandt, Esq.

**Hon. Norman A. Mordue, Chief United States District Judge**

**MEMORANDUM DECISION AND ORDER**

**I.      INTRODUCTION**

      Defendant Manuel Goncalves is charged in a three-count indictment with: (1) conspiring to cultivate, manufacture, distribute and possess with intent to distribute marijuana and possessing with intent to distribute cocaine, cocaine base ("crack"), and heroin (21 U.S.C. § 841(a)(1)); (2) possessing six firearms in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)); and (3) possessing firearms while having been convicted of a prior felony (18 U.S.C. §§ 922(g)(1) and 924(a)(2)).  Dkt. No. 7.

On October 30, 2007, defendant filed a motion pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure for suppression of all evidence obtained as a result of law enforcement's entry into his residence on May 10, 2007. Dkt. No. 15. The government opposed defendant's motion and cross-moved for discovery. Dkt. No. 19. Defendant opposed the government's motion for discovery and cross-moved for an order compelling the government to respond to his requests for discovery and for exculpatory material. Dkt. No. 22. The Court held an evidentiary hearing regarding defendant's motion to suppress on February 6, 2008, and directed the parties to file proposed findings of fact and conclusions of law.

## II.    MOTION TO SUPPRESS

Defendant moves to suppress evidence law enforcement obtained following two warrantless entries into his residence on May 10, 2007, on the ground that the entries violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Defendant also moves to suppress evidence law enforcement obtained following their execution of a search warrant at his residence on May 10, 2007. The following, based upon the Court's consideration of the testimony and exhibits produced at the hearing as well as consideration of the parties' arguments and the applicable law, constitutes the Court's findings of fact and conclusions of law.

### A.    Findings of Fact[1]

The events at issue in this case stem from a 911 call on May 10, 2007, by Betty Mulkey, an acquaintance of defendant's, to request that an "officer meet [her] at 114 Lawrence Street" in

---

[1]Although defendant submitted an affidavit outlining his version of the facts at issue, he did not testify at the hearing. Dkt. No. 15-9. The Court has reviewed the affidavit, but does not find it credible. Nor does the Court credit the affidavit of Ashlee Michalowski, which defendant submitted in support of the motion to suppress, in the findings of fact. Dkt. No. 15-8. Michalowski's affidavit serves principally to attack Betty Mulkey's credibility and indicates that the police officers who spoke with Mulkey "had an attitude" with her. *Id.* at ¶ 6.

Syracuse, New York so that she could "take [her] car and [her] plates" from defendant, who, she

claimed, would not return them to her.  Dkt. No.15-3.  According to the transcript of the 911 call,

Mulkey also reported to the operator that defendant used illegal drugs and possessed weapons:

> OPERATOR: Alright, do you know whether [defendant will] be home?
>
> MULKEY: He's home right now.
>
> OPERATOR: All right.
>
> MULKEY: I asked, 'cause I asked him for the plates and he told me, you know because I owe him $300, he says well, when you give me the money I'll give you the plates. And it was like, look, I don't wanna be grimey, I said, but if you don't give 'em to me so I cancel out my insurance… he says, well you're not gettin' 'em, and I said fine, then I'll do it the hard way.
>
> OPERATOR: Okay, all right. Um, do you know whether he…drinks or does illegal drugs?
>
> MULKEY: He does drugs.
>
> OPERATOR: Does drugs, okay.
>
> MULKEY: Oh yes. He does heroin and Oxycontins.
>
> OPERATOR: Okay, do you know whether he carries any weapons on him?
>
> MULKEY: Yes he does. He's got a 9-millimeter and a .25 in the house.
>
> OPERATOR: Okay, does he live alone?
>
> MULKEY: Um, yes he does, well, his daughter's staying with him right now, but um, his ex-wife and his kids are over there right now too.
>
> OPERATOR: Okay. And 9-millimeter, what was the other gun?
>
> MULKEY: (Sniffs) .25.
>
> OPERATOR: .25.
>
> MULKEY: And several we- rifles, that's it in the safe.

3

OPERATOR: Okay. (pause) All right, you wait at 124 Lawrence, okay, watch for the police, because they're, if that's not the address, they're not going to go looking for you.

*Id.*

Syracuse Police Officer Patrick Coyle testified that on May 10, 2007, at approximately 3:30 p.m., a police dispatcher directed him to 114 Lawrence Street to attend to a dispute over a vehicle.[2] Transcript, p.8 ("T.8").  Officer Coyle stated that he "stopped in front of 114 Lawrence Street and . . . met with Betty Mulkey" who previously called 911.  *Id.*  Officer Coyle testified that Mulkey said she was "trying to retrieve a vehicle that was parked in the driveway at 114 Lawrence Street."  T.9.  According to Officer Coyle, Mulkey identified defendant as the person who lived in the residence at 114 Lawrence Street, and stated that she had been inside "at about 2:00 and at the time she saw two handguns in the bedroom of that residence."  *Id.*  Officer Coyle testified that Mulkey also stated that she observed "possibly a rifle" and that the firearms were "in the bedroom" on a bed and another was inside a safe.  T.10.  Officer Coyle described Mulkey's demeanor as "a little bit annoyed about . . . not being able to get her vehicle" but that she was not upset or crying while talking to him.  *Id.*

Officer Coyle testified that after talking to Mulkey, he "walked up to the front porch of 114 Lawrence" where Stacey Byrne Goncalves, defendant's wife, was standing on the steps to the residence.  T.11.  Officer Coyle stated that he asked Stacey Goncalves where defendant was and she replied that he was "inside."  T.12.  Officer Coyle testified that Stacey Goncalves, whose demeanor he described as "indifferent" and "cooperative", T.15,  "then turned around and

---

[2] Syracuse Police Officer Eric Lindgren responded to 114 Lawrence Street with Officer Coyle and was present during the events at issue.  Officer Lindgren, who is on military duty in Afghanistan, did not testify.  Defendant, however, submitted Officer Lindgren's sworn report concerning the entry in question.  Dkt. No.15-6.

4

proceeded inside the door and I followed her in to another door.  She then proceeded through that door and I stepped inside the second door into the threshold of the doorway."[3]  T.13.  Officer Coyle stated that he was "right behind" Stacey Goncalves, that she did not close either of the doors behind her, *id.*, and that she did not tell him to stop or that he could not come in.  T.15.  Officer Coyle further stated that he:

> was somewhat skeptical of Mulkey's statement and I thought she was using that as a way to have the police go in, annoy [defendant] and to get her license plates back or vehicle.  So I was, in the back of my head, I had that the guns might be in the house, but I didn't believe her a hundred percent . . . .  It was more of an officer safety reason, I was walking into a house where there was supposed to be guns so I didn't want to give this person an opportunity to see me coming.

T.40-41.  Officer Coyle testified that as soon as he stepped "through the threshold of the door and immediately upon entry, [he] noticed a very strong odor of marijuana."  T.16.

According to Officer Coyle, Stacey Goncalves asked the children in the residence where defendant was, and that defendant then "appeared from the unknown location, I guess it was the back of the house."  T.16-17.  Officer Coyle testified that defendant "was highly agitated" and told him "to get the fuck out of his house."  T.17.  Officer Coyle stated that he informed defendant that they "were conducting [an] investigation about a vehicle that was parked in his driveway" and that defendant "[b]ecame combative, told me to get out, numerous times, and then he started making a beeline for the bedroom door."  T.17-18.  Officer Coyle followed defendant toward the door and defendant "slammed the door . . . in front of me, I had my foot in the door, the children were yelling, Stacey [Goncalves] was yelling get out."  T.18.  Officer Coyle testified that Stacey Goncalves's demeanor had changed and that she had become uncooperative and told

---

[3]According to the testimony at the suppression hearing, the residence at 114 Lawrence Street has a front door, which leads into an enclosed front porch, or foyer, followed by french doors which lead into the living room of the residence.  T.128, 132.

him to "get the fuck out of her house".  *Id*.

Officer Coyle stated that the door to the bedroom was translucent and he observed defendant slide a dresser in front of the door, heard "drawers opening and closing, some banging around", and then heard defendant call 911.  T.19.  Officer Coyle stated that when defendant barricaded himself in the bedroom, he drew his weapon, T.35, "[b]ecause I had a report that there's potentially guns in that bedroom, so for officer safety reason, I took my weapon out.  I didn't know where he was going, he could be going for the weapons."  T.41-42.  Officer Coyle testified that while defendant was calling 911, he was on his "radio requesting a patrol supervisor to respond."  T.20.  Officer Coyle stated that defendant then exited the bedroom, handed him the phone and asked him to speak to the 911 operator.  *Id*.  Officer Coyle testified that he refused.  *Id*.  Officer Coyle stated that after defendant left the bedroom he was combative and uncooperative, he was highly agitated," and was "taking a defensive posture."  *Id*.  Officer Coyle explained that for "officer safety reasons" he did not want defendant to get too far away from him, but that every time he tried to get near him, defendant acted as if he was going to punch him.  T. 20-21.

Syracuse Police Sergeant Scott Bodah responded to the premises following defendant's 911 call and Officer Coyle's request for a patrol supervisor.  T.45.  Sergeant Bodah testified that he entered the residence through the back door, *id*., and found Officers Coyle and Lindgren and defendant in the living room "just standing there".  T.47.  Sergeant Bodah stated that defendant told him that "these officers won't leave my house, I've asked them to leave my house, I want them to leave my house."  T.47.  Sergeant Bodah testified that he asked Officer Coyle why they were in defendant's house and why they were not leaving.  *Id*.  Sergeant Bodah stated that Officer Coyle explained "that he was there on this vehicle matter, that he smelled a strong odor of

marijuana, he was very concerned for his safety because he . . . believed that the defendant had a gun in his bedroom." *Id*. Sergeant Bodah testified that defendant "reached out to [him] with a cell phone and he said it's my attorney . . . and he wants to talk to you". T.48. Sergeant Bodah stated that he did not talk to the attorney and after that, escorted defendant out of the house, primarily, for officer safety reasons. T.48-49.

Officer Coyle testified that he followed Sergeant Bodah and defendant outside the residence. T.23-24. Officer Coyle stated that after exiting, Stacey Goncalves "slammed the door" behind him and locked it. T.25. Officer Coyle testified that after talking with the officers, defendant eventually left the premises. T.24.

Officer Coyle testified that he had a conversation with Stacey Goncalves "through the window of the door requesting that she open it and she refused, numerous times." T.25. Officer Coyle explained that he had "numerous conversations" with Stacey Goncalves, during which "she'd talk to me for a minute, leave, come back two minutes later. I'd ask her again to open the door, she'd leave, come back, this went on for quite a while." *Id*.

Officer Coyle testified that, at "some point" he contacted the special investigations division ("SID") to get a warrant. *Id*. Syracuse Police Detective Susan Izzo from the SID, narcotics section, testified that when she arrived at work on May 10, 2007, at approximately 4:00 p.m., her lieutenant informed her that the patrol units had a call at 114 Lawrence Street. T.59-60. Detective Izzo explained that because her lieutenant had assigned her a "drug complaint regarding that location" two days earlier she "was to go down and see what was going on." T.60. Detective Izzo stated that she arrived at 114 Lawrence Street at approximately 4:20 p.m., where she observed several uniformed police officers on the scene. T.61. Detective Izzo testified that

Officer Coyle apprised her of the nature of "the call" and "what had happened up to that point."

*Id*. Detective Izzo stated that she observed Mulkey standing in the street near the patrol cars and

that "she briefly interviewed her about her complaint and about what led to the situation and

specifically about the gun situation, the information she had regarding that."  T.62.  According to

Detective Izzo, Mulkey stated that:

> she was in the house about the license plate issue with her car, that they had got in an
> argument over it but she was in his bedroom at one point . . . I asked her if she had
> seen any guns or handguns specifically and she said she hadn't, she sat on his bed and
> she said she put her hand down on the bed and felt what appeared to be a gun
> underneath the sheets or covers.  So she hadn't seen a handgun but she said there's
> a safe in Mr. Goncalves's room, the bedroom, the safe door had been open and she
> saw that he had rifles or something in the safe and she also said she saw marijuana
> and cocaine in the safe, that day at just about 2:30 in the afternoon.

*Id*.  Detective Izzo stated that after obtaining Mulkey's statement, she and Officer Coyle went

"back to the office and started typing up a search warrant."  T.64.

Syracuse Police Sergeant David Proud testified that he responded to 114 Lawrence, at

approximately 5:00 p.m., based on a call from a patrol commander "in regards to - - as well as

other civil matters, there was information regards to a marijuana grow operation as well as

weapons being possessed within the residence."  T.82.  Sergeant Proud stated that the patrol

commander informed him that there was a female and four children inside the residence and

apprised him of the events leading up to the point of Sergeant Proud's arrival.  T.83.  Sergeant

Proud stated that he was aware that Detective Izzo was in the process of obtaining a search

warrant for the residence.  T.84.

Sergeant Proud testified that at that point, police had surrounded the residence, and that he

attempted to engage Stacey Goncalves.  *Id*.  Sergeant Proud stated that he advised Stacey

Goncalves that "we were obtaining a search warrant . . . that we weren't leaving, she needed to

come out of the residence and bring the children out". T.85. Sergeant Proud testified that when he was talking to Stacey Goncalves at the window, he detected "a very strong odor of marijuana that appeared to be emanating from within the residence." T.88. Sergeant Proud stated that Stacey Goncalves "flip-flopped" between cooperating with police and refusing to exit the residence for 30 to 45 minutes. T.85. According to Sergeant Proud, Stacey Goncalves subsequently agreed to leave the residence and exited with her children through the front door. *Id.*

Sergeant Proud stated that after securing Stacey Goncalves and two of her older children, "we went to the rear of the residence and subsequently forced entry through the rear entrance door." T.87. Sergeant Proud explained that he forced entry after Stacey Goncalves exited the residence because:

> the information that was received was in regards to weapons possession relative to the interior of the residence. The primary concern at that point is as far as officer safety as well as the safety of the civilians in the area. At that point we had a perimeter on the house, officers basically locking down this house when the persons were still inside. At that point we want to get in, assure that there's nobody else in the residence that's securing any weapons that can be used against officers and to also assure that there's no one in there involved in destruction of evidence.

T.89. Sergeant Proud testified that after officers entered the residence and conducted a protective sweep of the basement, the main floor, and the second floor, they brought Stacey Goncalves and two of the children back into the residence. T.90, 92. Sergeant Proud stated that they were in the residence for approximately one hour and that during that time police did not search the residence but waited for the search warrant. T.92-93.

Detective Izzo testified that Judge Kate Rosenthal signed the search warrant at 6:40 p.m., and that she telephoned Sergeant Proud to advise him that the search warrant had been signed.

9

T.65.  Sergeant Proud stated that the law enforcement began searching the house upon receiving notification from Detective Izzo that the warrant had been signed.  T.94.

Detective Izzo testified that she subsequently returned to 114 Lawrence Street to assist in the execution of the search warrant.  T.66.  Detective Izzo testified that during the search, police recovered, *inter alia*, equipment used for a marijuana grow operation, including, lamps, bulbs, and copper wiring, an upper slide assembly to a 9-millimeter semiautomatic handgun, several types of ammunition, five rifles and two shotguns, beige chunky substance that looked like crack, "lots of marijuana plants", a scale, and drug packaging equipment.  T. 67-68.

Stacey Goncalves testified on defendant's behalf at the suppression hearing and provided a different account of law enforcement's entries into 114 Lawrence Street on May 10, 2007.  Stacey Goncalves stated that she was expecting the police to arrive that day because Mulkey previously told her that she was going to call the police.  T.151.  Stacey Goncalves testified that she later looked out the window and saw Mulkey speaking to the police.  *Id*.  Stacey Goncalves stated that the police officers knocked on the front door, which was closed and locked.  T.128.  Stacey Goncalves testified that she:

> opened the door and asked them if I can help them with anything and they said that they need to speak with [defendant] about some car plates and a car, and I told them, okay, hang on a minute, and I turned around to go get him and one of the officers walked right in behind me and went to walk past me.  When I went to grab his arm to ask what he was doing, the other officer grabbed my arm and pulled me back, said he was just going to get my husband.

*Id*.  Stacey Goncalves clarified that when she turned around to get defendant, she "went to shut the door . . . but the door wouldn't shut all the way, I didn't bother to look why, I just kind of flinged it."  T.129.  Stacey Goncalves stated that she did not invite the officers into the house.  *Id*.  Stacey Goncalves tesified that when defendant saw that the officers were in the house "he started

10

screaming for them to get out of the house and I told them to get out of the house." T.130.

    According to Stacey Goncalves, after "a sergeant showed up", the law enforcement officers forced defendant out the back door of the residence, at which point she "shut and locked" the back door. T.135. Stacey Goncalves stated that the front door was also locked. *Id*. Stacey Goncalves testified that police officers then started knocking on doors and windows attempting to talk to her and that she "kept saying to them, why do you want to talk to me . . . you have the vehicle, the complaint's over with, why are you still here, leave me alone, and they wouldn't leave." T.136. Stacey Goncalves stated that she stayed in the house with her four children for "[a]bout two hours" before she exited the residence. *Id*.

    Stacey Goncalves testified that when she left the residence with her children and attempted to leave the premises Detective Proud stopped her, handcuffed her, and dragged her from the front of the house to the back of the house, where the officers had forced entry. T.139-41. Stacey Goncalves stated that Detective Proud "tossed" her back into the house. T.141. Stacey Goncalves noted that it was approximately 5:20 p.m., at the time, and stated that there were police officers in the house "[l]ooking around, pulling stuff out of cabinets, pulling stuff out of the bedroom, they were upstairs, they went in the crawlspace attic, in the basement . . . ." T.141-42. Stacey Goncalves stated that a police officer handed her a search warrant at "about quarter after 7 at night" and that she was arrested at approximately 10:45 p.m. T.144.

    Having presided over the suppression hearing and observed Stacey Goncalves testify, the Court does not find her testimony credible. Not only was it inconsistent with Officer Coyle's straightforward version of the events,[4] but portions were incredible. For instance, although

---

[4]Additionally, Officer Coyle's testimony was consistent with his written reports regarding the events in question, which he affirmed under penalty of perjury. Dkt. No. 15-5 and 15-10.

Stacey Goncalves admitted that the entire house "had a chemical smell" and that she had smoked marijuana for most of her life, she nevertheless maintained that she was not able to identify that smell as marijuana.  T.172.   Further, Stacey Goncalves testified that at the time of her arrest, she was addicted to marijuana, cocaine, and/or morphine and stated that "to a certain extent" those drugs affected her perception and memory.  T.175.  Thus, the Court declines to credit to her testimony.

**B.**      **Conclusions of Law**

        **1.**      **Warrantless Entries**

        The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *e.g.*, *Whren v. United States*, 517 U.S. 806, 809 (1996). Indeed, "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,'" *Payton v. New York*, 445 U.S. 573, 585 (1980), *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) ("[I]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.") (quotation marks omitted).  Because reasonableness is the "ultimate touchstone" of the Fourth Amendment, there are several exceptions to the warrant requirement, *id.*, including consent and exigent circumstances.  *See Schneckcloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978) ("[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is

objectively reasonable under the Fourth Amendment.").

### a.    First Entry

Defendant argues that the Court must suppress evidence that Officer Coyle detected the odor of marijuana upon first entering the residence because Officer Coyle entered without a warrant in violation of the Fourth Amendment.  The government opposes suppression and contends that Stacey Goncalves consented to Officer Coyle's entry.

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  *Schneckcloth*, 412 U.S. at 227.  A finding of consent requires proof of more than "mere acquiescence in a show of authority," *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.. 1993), but the consent "need not be expressed in a particular form"; it "'can be found from an individual's words, acts or conduct.'"  *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (quoting *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)).  Consent is involuntary if it is exacted from explicit or implicit coercion caused by implied threat or covert force.  *See United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

In this case, the Court finds, based on the totality of all the circumstances, that when Stacey Goncalves, in response to Officer Coyle's inquiry as to where defendant was, stated that defendant was inside, turned around and entered the house without further explanation or instruction, and left the doors open behind her, she impliedly consented to the officers' entry into the house for the purpose of locating defendant.  Moreover, there is no credible evidence that the officers used explicit or implicit coercion to obtain entry; Officer Coyle made no show of authority but simply asked Stacey Goncalves where defendant was and then followed her into the

13

house after she replied that he was inside.  Officer Coyle testified that Stacey Goncalves acted

cooperatively and did nothing to stop them from following her or to indicate that she did not

intend for them to follow her.  Although Stacey Goncalves did not explicitly invite the officers

into the house, the Court finds that her conduct and the absence of coercion demonstrates her

implied, voluntary, consent to their entry.  *See Deutsch*, 987 F.2d at 883 (upholding as reasonable,

the district court's determination that the defendant's housemate gave law enforcement voluntary

consent to enter and "unmistakably invited the officers inside" when he "'advised the officers that

his identification was inside the house and entered for the purpose of showing them his

identification").  Accordingly, defendant's motion to suppress evidence that Officer Coyle

detected the odor of marijuana upon entering the house is denied.

### b.    Second Entry

Defendant argues that there was no justification for law enforcement's second warrantless

entry into the house and that any evidence obtained as a result of that search must be suppressed.

The government argues that probable cause based on the odor of marijuana and exigent

circumstances justified law enforcement's forced entry and protective sweep of the house after

Stacey Goncalves exited the residence.

As initial matter, even assuming there was probable cause to believe that incriminating

evidence will be found within a home, it is well settled that "absent exigent circumstances, a

warrantless entry to search for weapons or contraband is unconstitutional even when a felony has

been committed and there is probable cause to believe that incriminating evidence will be found

within."  *Payton*, 445 U.S. at 587-588 (footnote omitted).  *See Illinois v. Rodriguez*, 497 U.S. 177,

181 (1990); *Chimel v. California*, 395 U.S. 752, 761-763 (1969); *Johnson v. United States*, 333

U.S. 10 (1948).  Thus, unless exigent circumstances justified the officers' second entry into the house, any evidence obtained as a result of that search must be suppressed.

The exigency of a situation may insulate a warrantless search from constitutional attack if "law enforcement agents were confronted by an 'urgent need' to render aid or take action." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (en banc) (quoting *Dorman v. United States*, 435 F.2d 385, 391 (D.C.Cir. 1970) (en banc)).  The Second Circuit has explained that the "urgency" of the officers' need depends on six factors:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause ... to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*MacDonald*, 916 F.2d at 769-70 (omission in original).  The Second Circuit has considered two more factors in addition to those above, "namely, a reasonable belief by law enforcement officers that (1) the targets of their investigation are armed; and (2) quick action is necessary to prevent the destruction of evidence."  *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995).

No view of the facts in this case would support the government's argument that exigent circumstances justified law enforcement's second warrantless entry into the house.  It is undisputed that defendant was not on the premises at the time.  Moreover, law enforcement's purported concern that a delay in entering the premises would result in the destruction of evidence is undermined by the absence of facts suggesting that anyone was inside the house once Stacey Goncalves and her children exited.  Indeed, police, at that point, had surrounded the premises ensuring that no one could enter or exit the residence unobserved.  Thus, defendant's motion to suppress any evidence obtained as a result of law enforcement's second entry into the house is

granted.

**B.     Search Warrant**

Defendant moves to suppress evidence seized pursuant to the search warrant on the grounds that: (1) the decision to seek a search warrant was prompted by information law enforcement obtained as a result of an illegal search; (2) the application contained false or misleading statements and omitted material facts; and (3) law enforcement began the search prior to the issuance of the warrant.

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV; *see also* Fed.R.Crim.P. 41.  In reviewing a magistrate's probable cause determination, the Court must "accord substantial deference to the magistrate's finding and limit . . . review to whether the issuing judicial officer had a substantial basis for the finding of probable cause."  *United States v. Singh*, 390 F.3d 168, 181 (2d Cir. 2004) (quotation omitted).  "To establish probable cause to search a residence, two factual showings are necessary-first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence."  *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citing *United States v. Harris*, 403 U.S. 573, 584 (1971)).

**1.     Decision to Seek Warrant**

Defendant asserts that evidence obtained as a result of the search warrant must be suppressed because evidence law enforcement observed during the two warrantless prompted their decision to seek a warrant.  The Court previously concluded that Stacey Goncalves's consent

16

justified the first warrantless entry, accordingly, the Court turns to defendant's argument that evidence obtained as a result of the search warrant must be suppressed because the second, illegal entry and search, "likely" prompted the police to seek the search warrant.

In *Murray v. United States*, 487 U.S. 533 (1988), the Supreme Court held that the independent source exception to the exclusionary rule permits "second-look" warrants when the "later, lawful seizure is genuinely independent of an earlier, tainted one." *Id*. at 542.  As the Second Circuit has explained:  "The two elements that must be satisfied to allow admission in such circumstances are: (1) the warrant must be supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct." *United States v. Johnson*, 994 F.2d 980, 987) (2d Cir. 1993) (citing *Murray*, 487 U.S. at 542).

Both elements are satisfied in this case.  First, evidence of Officer Coyle's detection of the odor of marijuana during the first, legal, entry and Mulkey's statement regarding the presence of firearms and illegal drugs in the house amply provided probable cause to believe that a crime had been committed and that evidence of that crime was located in the house.  Further, it is undisputed that law enforcement obtained this evidence prior to the second, illegal search.  Thus, the warrant is supported by probable cause derived from sources independent of the second, illegal, entry.

Second, there is no evidence that law enforcement's decision to seek the warrant was prompted by information gleaned from the second, illegal, entry into the house.  Indeed, there is no evidence that either Detective Izzo or Officer Coyle, who left the premises to assemble a warrant application prior to the second entry, were even aware that a second entry had occurred

until they returned to the premises after obtaining the warrant.  Detective Izzo testified that when she first arrived at the premises that day, Officer Coyle advised her that Stacey Goncalves was in the house and had locked police out of the house.  T.61.  Detective Izzo stated that Officer Lindgren finished taking Mulkey's statement at approximately, 4:55 p.m., T.77, after which she and Officer Coyle went "back to the office and started typing up a search warrant."  T.64. Detective Izzo testified that Sergeant Proud, who initiated the second entry, T.89, had not arrived on the scene before she left to "go type up the search warrant".  *Id.*  Further, Detective Izzo testified that while preparing the warrant application she was not in contact with the officers at the scene, T.78, and, although she talked to Sergeant Proud on the way to the office, it was to "fill[] him in as to what was going on".  T.79.  Detective Izzo stated that Sergeant Proud did not tell her at any time prior to procuring the warrant that he had observed marijuana in the house. T.79.  Thus, the government has adduced evidence showing that the decision to seek the search warrant was not prompted by, or based on, any information obtained from the second illegal search.

### 2.     False or Misleading Information and Material Omissions

"In certain circumstances . . . a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure."  *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). "However, every statement in a warrant affidavit does not have to be true." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation marks omitted).

"[A] defendant may challenge the validity of a search warrant alleged to contain deliberately or recklessly false or misleading information."  *United States v. Martin*, 426 F.3d 68,

18

73 (2d Cir. 2005) (citing *Franks v. Delaware*, 438 U.S. 154, 164-72 (1968)).  "To void the warrant and suppress the evidence, a defendant must demonstrate, by a preponderance of the evidence, that (1) the affidavit contained 'a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the allegedly false statement is necessary to the finding of probable cause.'" *Id*. (quoting *Franks*, 438 U.S. at 156).

The search warrant application includes an affidavit by Detective Izzo, sworn statements by Officer Coyle and Betty Mulkey, and defendant's arrest history.  First, defendant argues that Officer Coyle's statement that Mulkey "said she saw the handguns today" was false because her statement indicated nothing more than that she "could feel what felt like a handgun under the bed sheets".  While Officer Coyle's statement that Mulkey "saw the handguns" may be incorrect, the Court cannot conclude that it is a reckless disregard for the truth.  Moreover, Detective Izzo accurately recounted Mulkey's statement that she "felt" a handgun under the sheets on defendant's bed in her affidavit, and, in any event, Detective Izzo submitted Mulkey's statement for Judge Rosenthal's consideration as part of the search warrant application.

Second, defendant argues that Officer Coyle's statement that he "noticed a strong odor of marihuana" upon entry into the house must be excised from the warrant application because it was the result of a prior, illegal, search.  As discussed above, the Court finds this argument without merit.

Third, defendant argues that Detective Izzo recklessly misrepresented defendant's criminal history to the issuing court when she stated that his "arrest history showed 21 arrests for various charges including criminal possession of a weapon, possession and sale of marijuana" because defendant has no convictions for weapons offenses or the sale of marijuana or other

drugs.  Defendant, however, does not dispute that he has 21 arrests.  Moreover, in her statement, Detective Izzo specified that she was referring to defendant's "arrest history".  Further, the document attached to the warrant application states that it contains information regarding defendant's arrests.  Since both Detective Izzo and the document containing defendant's arrest history accurately recount defendant's arrest history and do not purport to represent anything else about defendant's criminal history, or number of convictions, the reviewing court could infer nothing more than that defendant had been arrested 21 times.  Thus, there is no basis upon which to conclude that the search warrant application contained misleading information regarding defendant's criminal history.

Finally, defendant argues that Officer Coyle failed to apprise the reviewing court that he was skeptical of Mulkey's credibility.  Defendant's argument is without merit.  Although Officer Coyle testified that he was skeptical of Mulkey's assertions regarding defendant initially, his investigation of her complaint corroborated her statement that defendant possessed drugs when he detected the odor of marijuana upon entering defendant's house.  Thus, there is no basis upon which to conclude that either Detective Izzo or Officer Coyle acted with reckless disregard for the truth by failing to inform the reviewing court that Officer Coyle, initially, was skeptical of Mulkey's complaint.

### 3.    Search Prior to Issuance of Warrant

Defendant argues that evidence seized pursuant to the search warrant must be suppressed because law enforcement began their search of the residence after entering the residence the second time and prior to the issuance of the search warrant.  Specifically, defendant asserts that Stacey Goncalves's testimony that law enforcement conducted an exhaustive search of the

20

residence prior to the search warrant and the "Exchangeable Image File Format" information recorded in connection with each photograph Sergeant Proud took with his digital camera to document the search, demonstrate that police recovered the evidence at issue prior to the issuance of the warrant 6:40 p.m.

As discussed, the Court declines to credit Stacey Goncalves's testimony.  Additionally, Sergeant Proud testified that he did not check the time on the digital camera prior to using it. T.121-22.  Indeed, neither party presented evidence regarding whether the time was set accurately on the digital camera in question.  Further, during the hearing, defense counsel agreed to the admission of the photographs without the time notation defense counsel made on the back of each photograph.  T.122, Def's Exs. 1-27.  Finally, Sergeant Proud testified that law enforcement did not commence the search of the residence until receiving notification from Detective Izzo that the warrant had been signed.  T.94.  Thus, there is no credible evidence upon which to conclude that law enforcement searched the residence prior to the issuance of the warrant.  Accordingly, defendant's motion to suppress physical evidence obtained as a result of the search warrant is denied.

## III.   DISCOVERY

### A.      Government

The government has cross-moved for reciprocal discovery pursuant to Rule 16(b)(1), and seeks an order directing defendant to permit the government to inspect and copy: physical evidence and results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case.  Additionally, the government seeks an order directing defendant to disclose a written summary of testimony defendant intends to use at trial

under Rules 702, 703, and 705 of the Federal Rules of Evidence.  Defendant has responded to the

government's motion and states that he has provided all requested evidence.  Accordingly, the

government's motion is denied as moot.

### B.      Defendant

#### 1.      Photographs and Receipt

Defendant contends that the government has failed to reply to his discovery request for

"entry, exit and evidence" photographs taken by the police at the time of one of the searches as

well as a receipt for the purchase of a safe taken during one of the searches.  Dkt. No. 22, p. 2.

The government and defendant relied on a number of photographs at the suppression hearing that

were taken during law enforcement's entry into and search of defendant's house.  Thus, it appears

the government has satisfied it's obligation in this regard.  The government has not opposed or

otherwise responded to defendant's request for discovery of a receipt for the purchase of a safe.

Accordingly, defendant's motion for an order directing the government to permit inspection of a

receipt for the purchase of a safe, if it exists and is in the government's possession, is granted.

#### 2.      *Brady* Material

Defendant requests that the government turn over any and all information which could be

deemed exculpatory in this case pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  The

government's response to defendant's discovery demand indicates that the government is aware

of its continuing duty under *Brady* and that "[n]o such evidence is known to exist at the time."

Dkt. No. 22-3.  Accordingly, defendant's demand for *Brady* material is denied.

#### 3.      Individual Responses

Finally, defendant requests an order directing the government to respond individually to

22

each of his discovery requests set forth in Dkt. No.22-2.  Defendant neither cited legal authority in support of this request nor indicated that the discovery the government had provided is insufficient.  Accordingly, defendant's motion is denied without prejudice to renewal.

**IV.      CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that defendant's motion to suppress evidence obtained following law enforcement's first entry into the residence at 114 Lawrence Street is **denied**; and it is further

**ORDERED** that defendant's motion to suppress evidence obtained following law enforcement's second entry into the residence at 114 Lawrence Street is **granted**; and it is further

**ORDERED** that defendant's motion to suppress evidence obtained following the execution of the search warrant is **denied**; and it is further

**ORDERED** that the government's cross-motion for discovery is **denied**; and it is further

**ORDERED** that defendant's cross-motion for discovery with respect to the receipt for the purchase of the safe is **granted**, and it is further

**ORDERED** that defendant's cross-motion for discovery is otherwise **denied** in its entirety without prejudice to renewal.

**IT IS SO ORDERED.**

Date:  May 15, 2008

Norman A. Mordue
Chief United States District Court Judge